**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

IN RE:

KENNETH W. BRYANT,                            CASE NO.: 11-30834-LMK
                                              CHAPTER: 7
    Debtor.

_____/

## ORDER GRANTING MOTION TO DISMISS

THIS MATTER came before the Court for evidentiary hearing on Wednesday, May 23, 2012, on Century Business Services, Inc.'s ("CBIZ") Motion to Dismiss under 11 U.S.C. § 707. Appearing at the hearing were William "West" Ritchie, representing Kenneth W. Bryant (the "Debtor"), Robert James Powell, representing Christine E. Carter ("Christine Carter") and Carter & Company, CPA, LLC ("Carter & Co."), and Jeffrey S. Dunlap and Lawrence B. Voit, representing movant CBIZ. At the hearing the Court took testimony, received evidence, and heard argument of counsel for the Debtor and Movant. The Court had the opportunity to observe the demeanor and credibility of the witnesses, the Debtor and Christine Carter. The Court makes the following findings of fact and conclusions of law:

*Procedural History*

CBIZ, the movant, is a judgment creditor of the Debtor. On March 31, 2010, the United States District Court for the Northern District of Ohio entered a judgment in favor of CBIZ for two counts of breach of contract against the Debtor in the amount of $1,330,457.00. Additionally, CBIZ was awarded attorneys' fees and costs of $170,576.10. Subsequently, on May 13, 2011, the Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code in this Court.

On September 9, 2011, CBIZ filed its Motion to Dismiss the Debtor's bankruptcy case based on the grounds that the Debtor filed his case in bad faith. On April 10, 2012, the Debtor filed a Motion for Summary Judgment on the Motion to Dismiss, arguing that under 11 U.S.C. § 707(a), bad faith could not be a basis for dismissal in a non-consumer debtor case. On April 19, 2012, the Court held a non-evidentiary hearing to consider the Motion for Summary Judgment. By entry of an order on May 24, 2012, the Court denied the Motion for Summary Judgment, concluding that bad faith may justify dismissal of a Chapter 7 case when shown. On May 23, 2012, the Court held an evidentiary hearing to consider the Motion to Dismiss.

*Facts*

In 1997, CBIZ purchased the Atlanta-based accounting firm Smith & Radigan P.C. ("Smith & Radigan") for $6 million. The Debtor was a former owner of Smith & Radigan and after the merger, became an executive employee at CBIZ. Under the merger, CBIZ acquired all of Smith & Radigan's assets and the former owners of Smith & Radigan, the Debtor included, received substantial amounts of cash and stocks. The Debtor received over $1 million through the merger (including $566,667 in stock and $160,000 in cash). The merger was completed with the execution of the Agreement and Plan of Merger (the "Merger Agreement") and the Executive Employment Agreement, which contained a non-compete clause. The Debtor signed both agreements. The United States District Court for the Northern District of Ohio found that the Debtor intentionally breached these two agreements with CBIZ. First, the District Court concluded that the Debtor breached the Merger Agreement by soliciting and causing Christine Carter, the Debtor's wife, then a CBIZ employee, to leave CBIZ and join the Debtor's competing business. Second, the District Court determined that the Debtor breached his Executive Employment Agreement with CBIZ by forming a competing business and soliciting CBIZ's

clients. In addition to intentionally breaching his contracts, the District Court also found that the Debtor violated the Federal Lanham Act[1] by intentionally using CBIZ's trade name without its authorization. According to the Debtor's Schedules, CBIZ holds a $1,551,896.10, unsecured nonpriority claim against the Debtor pursuant to the Judgment.

The Debtor is a sophisticated professional and certified public accountant with over thirty years of experience in the accounting business. The Debtor graduated from Auburn University in 1979 and began his business career at Touche Ross (nka Deloitte & Touche USA LLP), an international accounting firm, in Atlanta, Georgia and then moved to Smith & Radigan where he was a partner for twelve years. The Debtor is currently a partner at Carter & Co. located in Destin, Florida, and specializes in advising real estate clients and performing financial audits. Carter & Co. is a single-member Georgia limited liability company owned by the Debtor's wife, Christine Carter, who is its only member. The Debtor is a member of the American Institute of Certified Public Accountants and the Florida Institute of Certified Public Accountants. The Debtor has, on four or five occasions, testified as an expert witness on the subject of business valuation, though he has not done so for a number of years.

Christine Carter graduated from the University of Georgia in 1992. After graduating, Ms. Carter began her career at Smith & Radigan and worked almost exclusively for the Debtor, assisting with clients such as Security Properties, Inc. ("SPI"). The Opinion entered by the Northern District of Ohio contains the testimony of certain employees of CBIZ that the Debtor indicated to them that it was his intention to take Christine Carter with him when he resigned from CBIZ. The Court found that the Debtor facilitated or induced Christine Carter's departure from CBIZ so they could begin a business together. After they resigned from CBIZ, the Debtor

---

[1] *See* 15 U.S.C. § 1125(a).

and Christine Carter each started their own separate accounting companies; the Debtor set up S&R Consulting and Christine Carter set up SR Allen. Although they were working under separate business names, it is clear that Christine Carter was still working for the Debtor. The two leased office space directly next to each other and shared office staff and interns. Additionally, the Debtor and Christine Carter also shared former clients of CBIZ, including SPI. Under the arrangement, Christine Carter did most of the labor work for SPI and the Debtor then paid SR Allen for the labor and reimbursed the payroll for SR Allen employees.

In 2003, during the pendency of the litigation between the Debtor and CBIZ, Christine Carter and the Debtor formed Carter & Co. Although the Debtor has over ten years more professional experience as a certified public accountant than Christine Carter, she became the sole member of Carter & Co. and the Debtor became her employee. As sole member, Christine Carter receives an additional $40,000 per month in distribution income than the debtor. Other than the income distribution, the Debtor in every other way appears to be treated as an officer. At some point between 2008 and 2010, the Debtor and Christine Carter decided not to take a monthly distribution from Carter & Co. For the past four years, when Carter & Co. filed its tax returns, it listed the compensation paid to the Debtor and Christine Carter as "Compensation to Officers." The Debtor and Christine Carter were the only Carter & Co. personnel listed under this category. Nonetheless, Christine Carter testified that the Debtor is not an officer of Carter & Co., and reporting the Debtor's compensation in this way for the past four years to the IRS was a mistake. These tax returns were prepared by a Carter & Co. employee.

The Debtor has not made any payments towards the Judgment. CBIZ filed a judgment lien against the Debtor's home in Walton County, Florida. The Debtor never disputed the Judgment by taking an appeal. The Debtor testified that the only debts other than the Judgment

4

he has ever had in the last twelve years are secured real estate debts. CBIZ is the only creditor that filed a proof of claim against the Debtor. The record and testimony is undisputed that the only reason the Debtor filed this bankruptcy case is to avoid paying CBIZ on the Judgment. No unfortunate circumstance has befallen the Debtor to lead him to seek bankruptcy protection from this Court. The Debtor testified, for example, that he has never incurred any substantial medical expenses. In this regard, the Debtor enjoys a medical insurance plan 100% paid by Carter & Co.

The Debtor earns $24,000 per month from his professional accounting work at Carter & Co. Similarly, Christine Carter earns $24,000 per month from Carter & Co. In addition, as the sole owner of Carter & Co., Christine Carter receives an additional $40,000 per month in distribution income. Carter & Co. derives its revenue, in part, from the very clients the Debtor took from CBIZ in violation of the Merger Agreement. Eighty percent of the Debtor's clients at CBIZ remain clients of his today at Carter & Co.

Christine Carter pays and provides for the Debtor's lavish lifestyle. The Debtor's lifestyle includes annual vacation trips abroad to France and Italy (two vacations to each within the past five years), hobbies such as deep sea fishing and aviation, and private schools and home care for his children. The Debtor and his wife spend approximately $18,000 per year on vacations alone. The Debtor's lifestyle has not changed since the Judgment or the bankruptcy filing.

The Debtor pays $3,700 per month for mortgages on a home in Santa Rosa Beach, Florida that he previously occupied with his former wife Joan Bryant (the "Home"). As of the Petition Date, the mortgage balances on the Home were $622,720, and the market value was $600,000. The Debtor's sister, Judy Saul, holds a second mortgage on the Home in the amount of $350,000. The first mortgage is held by Bank of America. The Debtor testified that he receives $1,000 per month or $12,000 per year in rental income from the Home. The Debtor did

not report any rental income on his Schedules. Similarly, the Debtor did not report any rental income on his 2010 tax return.

The Debtor testified that he currently has $3,000 or $4,000 per month in disposable income. This amount will increase at the end of July 2012, by $2,000 per month, as a result of the end of the Debtor's child support obligations. At the end of July 2012, the Debtor's disposable income will be as much as $6,000 per month, an amount that equates to $72,000 per year. Furthermore, as of the petition date, the Debtor has $476,000 saved in an individual retirement account. The Debtor believes that he is entitled to a discharge under Chapter 7 of the Bankruptcy Code. The Debtor testified that "[i]f this isn't what bankruptcy is about, I'm not sure what bankruptcy is."

## CONCLUSIONS OF LAW

The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334(b). This is a core proceeding under 28 U.S.C. § 157(b)(2). Under the Bankruptcy Code, a bankruptcy court has the authority to dismiss a Chapter 7 petition for "cause". In particular, § 707(a) provides that:

> (a) The court may dismiss a case under this chapter only after notice and a hearing and only for cause, **including**-
>
> (1) unreasonable delay by the debtor that is prejudicial to creditors;
>
> (2) nonpayment of any fees or charges required under chapter 123 of title 28; and
>
> (3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521, but only on a motion by the United States Trustee.

11 U.S.C. § 707(a) (emphasis added).

6

"Cause" for dismissal under § 707(a) includes "bad faith." *See, e.g.*, *In re Piazza*, 451 B.R. 608 (Bankr. S.D. Fla. 2011) (dismissing debtor's Chapter 7 case upon a finding of bad faith) *aff'd*, 469 B.R. 388 (S.D. Fla. 2012);[2] *Bilzerian v. Securities & Exch. Comm'n* (*In re Bilzerian*), 276 B.R. 285 (S.D. Fla. 2002) (affirming bankruptcy court's "bad faith" dismissal under § 707(a)). By allowing a bankruptcy court to dismiss for bad faith, the *Piazza* court concluded that doing so preserved one of the primary policy aims of bankruptcy: to give the honest yet unfortunate debtor a fresh start—not the dishonest business person a head start. *Piazza*, 451 B.R. at 613-14. The *Piazza* court found a number of factors helpful in determining whether a debtor's bankruptcy case indicates "bad faith." These factors, identified in earlier decisions by courts in the Middle District of Florida, include the following:

(i) the debtor reduced his creditors to a single creditor shortly before the petition date;

(ii) the debtor made no life-style adjustments or continued living a lavish lifestyle;

(iii) the debtor filed the case in response to a judgment, pending litigation, or collection action;

(iv) there is an intent to avoid a large, single debt;

(v) the debtor made no effort to repay his debts;

(vi) the unfairness of the use of Chapter 7;

(vii) the debtor has sufficient resources to pay his debts;

(viii) the debtor is paying debts of insiders;

(ix) the schedules inflate expenses to disguise financial well-being;

(x) the debtor transferred assets;

(xi) the debtor is over-utilizing the protections of the Bankruptcy Code to the unconscionable detriment of creditors;

---

[2] Notably, *Piazza* was recently affirmed by the United States District Court for the Southern District of Florida. *See Piazza v. Nueterra Healthcare Physical Therapy, LLC*, 469 B.R. 388 (S.D. Fla. Apr. 26, 2012).

 (xii) the debtor employed a deliberate and persistent pattern of evading a single major creditor;

 (xiii) the debtor failed to make candid and full disclosure;

 (xiv) the debtor's debts are modest in relation to his assets and income; and

 (xv) there are multiple bankruptcy filings or other procedural gymnastics.

*Id.* at 614-15.

  Importantly, this "list of factors helps shed light on a debtor's intentions and helps to determine whether the debtor is an *honest but unfortunate debtor entitled to a fresh start*." *Id.* (emphasis added). As repeatedly recognized by the United States Supreme Court, this fresh start policy and fundamental purpose permeates the entire law of bankruptcy. *See Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) (explaining that "[t]he principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor'") (quoting *Grogan v. Garner*, 498 U.S. 279 (1991)); *see also In re Lombardo*, 370 B.R. 506 (Bank. E.D.N.Y. 2007) (emphasizing that <u>bankruptcy protection is a privilege not a right</u> and, given the fresh start policy, bankruptcy courts "routinely treat dismissal for prepetition bad-faith conduct as implicitly authorized by the words 'for cause'") (quoting *Marrama*, 549 U.S. at 372) (emphasis added). While the foregoing factors are instructive, no one factor is dispositive and the Court should look to all of the facts and circumstances in determining a debtor's "bad faith." *See Piazza*, 498 at 388; *see also In re Zick*, 931 F.2d 1124, 1127 (6th Cir. 1990) (explaining that "[t]he facts required to mandate dismissal based on a lack of good faith are as varied as the number of cases").

  In this case, the Court finds that CBIZ has shown sufficient *Piazza* factors. These factors, when taken together, establish the Debtor's bad faith. Accordingly, the Court finds that the Debtor does not deserve a fresh start because he is not an honest but unfortunate debtor and

8

seeks not a fresh start, but rather a head start against CBIZ. The Court examines the *Piazza* factors that are relevant to this case below.

Factor One: The Schedules, Claims Register, and the Debtor's testimony at the Hearing demonstrate that CBIZ is his only unsecured creditor. In fact, the only debts that the Debtor has ever had in the last twelve years are secured real estate debts. While the Debtor does not appear to have reduced his creditors down to CBIZ *shortly before* the Petition Date, the fact that he has no other debts displays a propensity to pay all his creditors except for CBIZ. For example, though the Home has negative equity, the record shows that the Debtor has consistently paid his sister, Ms. Saul, his junior undersecured creditor every month. In addition, prior to the Petition Date, the Debtor's testimony revealed that he spent $400,000 in legal fees to support a decade-long litigation against CBIZ, illustrating that he has the ability to pay significant amounts of money over time. Similarly, the record shows that the Debtor has been able to contribute nearly a half a million dollars to his individual retirement account. The Court finds that these facts strongly suggest that the Debtor's failure to pay CBIZ *anything* on the Judgment has more to do with the Debtor's unwillingness to accept the Judgment than an inability to pay at least some part of the Judgment.

Factor Two: The record and the testimony demonstrate that the Debtor has not made any lifestyle changes whatsoever. The Debtor's lifestyle is plainly lavish, being largely provided for by the Debtor's wife, Christine Carter. As a family, the Debtor and his wife incur more expenses in a month than most families do in an entire year. The testimony suggested that the Debtor is merely a beneficiary to this lifestyle and plays no part in deciding what the family does or how much it spends. While this is not the first case involving a husband living off the largess of his wife, this case involves something more. Importantly, the Debtor holds himself out merely as an

employee of Carter & Co., taking $288,000 per year in purported salary but claiming no ownership interest in the company. CBIZ has shown and this Court finds that, based on the Debtor's sophistication, experience, and importance to Carter & Co., the Debtor gave up any formal ownership stake in Carter & Co. to put his assets and earnings out of CBIZ's reach. The Court finds that these assets are not difficult to discern given the significant revenue the Debtor brings to Carter & Co. and the $40,000 in monthly distributions that Carter & Co. generates for the Debtor's wife (in addition to her $288,000 per year salary). The Court finds that the Debtor's lavish lifestyle supports a finding of bad faith. Simply put, the Debtor is enjoying a lavish lifestyle paid for substantially by the significant distributions of Carter & Co., which distributions are manipulated so as to put them out of reach of CBIZ. Although in form these benefits are flowing first through his wife, the Debtor's senior accounting experience, their past relationships, and the fact that a substantial portion of Carter & Co.'s revenue is derived from the Debtor's former clients at CBIZ, demonstrate that the Debtor and his wife have manipulated the firm revenue so as to divert income from the Debtor to his wife.

Factors Three and Four: The Debtor's testimony shows that he filed this case for the sole purpose of avoiding paying CBIZ on the Judgment. The record confirms that the Debtor had no other reason for filing the bankruptcy case.

Factor Five: The Debtor's testimony indicates that he has made no effort to pay CBIZ on the Judgment. In contrast, the Debtor's testimony was that he has always paid all of his creditors, except CBIZ. Under such circumstances, the Court finds that the Debtor's lack of any payment on the Judgment supports a finding of bad faith. *See Industrial Ins. Servs, Inc. v. Zick (In re Zick)*, 931 F.2d 1124 n.3 (6th Cir. 1991) (noting that "[w]hen a debtor capable of at least partial repayment has made every effort to avoid payment of an obligation, lack of good faith

sufficient to justify dismissal may be found") (citation, internal quotations marks, and brackets omitted).

Factor Six: The Debtor seeks to employ bankruptcy to evade paying on the Judgment. As the Bankruptcy Court for the Southern District of Florida observed: "The Bankruptcy Code is intended to serve those persons who, despite their best efforts, find themselves hopelessly adrift in a sea of debt. . . . Bankruptcy protection was not intended to assist those who are attempting to preserve a comfortable standard of living at the expense of their creditors." *In re Davidoff*, 185 B.R. 631 (Bank. S.D. Fla. 1995) (finding lack of good faith where the debtor's use of Chapter 7 was unfair to creditor). The record and testimony in this case shows that the Debtor did not find himself in bankruptcy despite his best efforts. On the contrary, the Court finds that the Debtor's own wrongdoing detailed in the Judgment is at the core of his current circumstances; rewarding this wrongdoing with a bankruptcy discharge would represent an unfair use of Chapter 7.

Factor Seven: The record demonstrates that the Debtor's resources are significant. At the end of July 2012, the Debtor will have $72,000 per year in *disposable* income based solely on his salary at Carter & Co. This amount does not include the payments he makes every month to his sister on her undersecured mortgage, income earned by Carter & Co., rental income the Debtor receives but does not report to the IRS or this Court, the Debtor's significant individual retirement account, or the amounts paid to his wife. The Debtor's testimony demonstrated an ability to pay significant debts over the years such as his substantial litigation expenses. The Court finds that, but for the Debtor's overt and obvious decision not to pay anything on the Judgment, the Debtor had and continues to have the wherewithal to make at least some payments to CBIZ.

11

Factor Eight:  The record reveals that, in connection with the Home, the Debtor is paying the unsecured debts owed to his sister, Judy Saul.

Factor Eleven:  The *Piazza* court found that the debtor acted in bad faith where the debtor sought to avoid a large court judgment, did not experience a sudden financial calamity, had no medical crisis, and the debtor and his spouse still maintained their jobs. These same facts are present here.  *See Piazza*, 451 B.R. 608.  Furthermore, permitting this bankruptcy case to continue does not further the policy aims of Chapter 7. *See In re Steffen*, 426 B.R. 907, 910 (Bank. M.D. Fla. 2010) (dismissing bankruptcy case where, as here, "continuing the case will not advance the Chapter 7 purposes of (1) providing the Debtor with a fresh start, or (2) liquidating the Debtor's non-exempt assets, (3) for the benefit of the Debtor's unsecured creditors"). Here, there is no unfortunate circumstance or event to explain why the Debtor resorted to bankruptcy. The Court finds that the facts and circumstances in this case do not support or justify a bankruptcy discharge under Chapter 7.

Factor Twelve:  For over a decade, the Debtor has employed a deliberate and persistent pattern of evading CBIZ.  The record reveals that the Debtor solicited away CBIZ clients and one of its employees in breach of agreements with CBIZ.  The employee he solicited away is Christine Carter, now his wife, who purports to make $64,000 per month in part based off the very CBIZ clients that the Debtor improperly took from CBIZ and formed the basis for the Judgment he now seeks to discharge.  The District Court found that the Debtor intentionally breached his agreements and harmed CBIZ.  The Debtor tried to avoid his obligations, resulting in a decade long litigation, significant legal expenses, and this bankruptcy case.  The Court finds that such actions demonstrate that the Debtor is seeking a head start and not deserving of a fresh start.

The foregoing factors establish the Debtor's bad faith. The testimony and documentary evidence that was presented at the hearing and in this case show that the Debtor's case should be dismissed for "cause" under § 707(a). Thus, it is hereby

ORDERED AND ADJUDGED that:

1. CBIZ's motion to dismiss the Debtor's bankruptcy case is GRANTED.

2. The Debtor's bad faith establishes cause for dismissal under § 707(a).

3. This order shall take effect upon entry.

DONE and ORDERED at Tallahassee, Florida this 3rd day of July, 2012.

LEWIS M. KILLIAN, JR.
Chief United States Bankruptcy Judge

Cc:   All interested parties